**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED HEALTHCARE SERVICES, INC.,** | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **v.** | : | **No. 17-555** |
| | : | |
| **CEPHALON, INC.,** | : | |
| | : | |
| **Defendants.** | : | |

**Goldberg, J.**                                                              **July 8, 2019**

## MEMORANDUM OPINION

    This antitrust matter, referred to as <u>In re Modafinil</u>, has presented many challenges for all involved. The multiple parties involved in this litigation include a brand drug manufacture, numerous generic drug companies, retail drug distributors, the Federal Trade Commission, and direct and indirect purchasers. The facts and law underlying the antitrust claims, which are premised on what is known as a "reverse patent settlement," also implicate Hatch-Waxman patent issues. Antitrust and patent trials have been held, appellate litigation in both the Third and Federal Circuits has occurred, and extensive settlement negotiations have taken place, resulting in the resolution of many segments of this case.

    One of the biggest challenges has been discovery and trial management and, in particular, balancing judicial resources with fairness to each of the respective parties' interests. The current Motion before me presents one such challenge.

    In what appears to the final phase of this matter, Plaintiff, United Healthcare Services ("UHS"), is pressing unresolved antitrust claims against two generic drug companies, Mylan Pharmaceuticals, Inc. ("Mylan") and Sun Pharmaceutical Industries, Ltd., Ranbaxy Laboratories, Ltd., and Ranbaxy Pharmaceuticals, Inc. (collectively, "Ranbaxy"). While <u>In re Modafinil</u> has been

ongoing for many years, UHS entered the fray only recently, filing a lawsuit in the District of Minnesota, which was removed to this Court on February 6, 2017.

UHS's case against Ranbaxy and Mylan was originally set to proceed to trial on July 8, 2019. I postponed this date so that the current discovery dispute could be sorted out and resolved. Leading up to the July 8, 2019 trial date, and in connection with the controlling trial scheduling order, UHS submitted an expert witness list, which included six experts that either had never been previously disclosed or whose accompanying reports included new opinions not previously subject to discovery. This prompted Ranbaxy to file the current Motion to Preclude UHS from Asserting New Experts, New Expert Opinions, and New Legal Theories at this Late Stage of the Case.

I have carefully reviewed the history of this case as it pertains to the remaining parties. Upon consideration of the parties' briefing on this Motion, as well as oral argument, I will grant Ranbaxy's Motion in part, precluding certain expert testimony. But, as detailed below, UHS will be permitted to offer certain opinions from the newly-identified experts.

## I.    FACTUAL BACKGROUND

A review of the background facts and the numerous moving parts is required to fully understand my ruling on Ranbaxy's Motion.

UHS's Second Amended Complaint, filed January 29, 2018, sets forth antitrust claims arising out of allegations that Defendants Mylan and Ranbaxy (among other generic pharmaceutical manufacturers) entered into reverse payment agreements with brand-name manufacturer and former Defendant, Cephalon, Inc. ("Cephalon"), to delay entry of generic versions of the drug Provigil into the market. This particular case involves the same subject matter as numerous cases consolidated in the In re Modafinil litigation, where numerous experts have previously been identified.

On January 30, 2018, a status and scheduling conference was held in the three remaining In re Modafinil cases: (a) King Drug Company of Florence, Inc. v. Cephalon, Inc., Civil Action No. 06-

1797 ("King Drug") brought by a putative class of direct purchaser plaintiffs ("DPPs") against Ranbaxy; (b) Vista Healthplan, Inc. v. Cephalon, Inc., Civil Action No. 06-1833 ("Vista") brought by a putative class of end payor plaintiffs ("EPPs") against Ranbaxy; and (c) the current case, United Healthcare Services, Inc. v. Cephalon, Inc., Civil Action No. 17-555 ("United") brought by individual plaintiff UHS against Cephalon, Mylan, Ranbaxy, Barr Laboratories, Inc. ("Barr"), and Teva Pharmaceuticals Industries, Ltd. and Teva Pharmaceuticals USA, Inc. (collectively, "Teva").[1]  At that conference, a discussion was held (1) regarding streamlining the cases with an eye towards a joint trial involving all three plaintiffs, and (2) whether additional fact and expert discovery was necessary. Following the conference, the parties were invited to submit correspondence explaining their preference as to whether all three remaining cases should proceed jointly in one trial or via separate trials.[2]  (ECF No. 77.)[3]

On March 1, 2018, upon consideration of the parties' correspondence, I scheduled both the King Drug case and the Vista case for trial on October 1, 2018.  As UHS was currently engaged in related litigation with Cephalon and its associated entities, I declined to include the United case in the October 1, 2018 trial and, instead, scheduled it for a Rule 16 conference on March 21, 2018.[4]  (ECF No. 93.)

---

[1]  Both the King Drug case and the Vista case were originally brought against Cephalon, Mylan, Barr, Teva, and Ranbaxy.  At the time of the status conference, however, the only remaining defendant in those matters was Ranbaxy.

[2]  During this conference, and relevant to the Motion before me, counsel for UHS noted that, "I do want to make clear we are an independent litigant with its own rights to present its own expert testimony and to present the facts in the most effective way we think is possible . . . we would need to show a good reason for more fact discovery, but we want to make sure we have the ability to present our experts and litigate our own case."  (ECF No. 190-2, at 22:15–23:1.)

[3]  Unless otherwise noted, citations to the docket refer to Civil Action No. 17-555.

[4]  UHS was originally part of the Vista case as one of a separate group of third-party payers seeking antitrust damages.  The Vista plaintiffs, including UHS, reached a collective settlement with brand

In advance of the Rule 16 conference, UHS, Mylan, and Ranbaxy submitted a Rule 26(f)

Report, which included a discussion about the use of experts who had been retained for other litigated

pieces of this case. In pertinent part, this Report stated:

> After an initial review of the expert opinions previously relied upon the Related Actions, during a conference call on April 6, 2018, <u>UHS raised with Mylan and Ranbaxy the possibility of a stipulation involving the adoption of certain prior expert opinions in an effort to streamline the litigation and conserve resources of the parties and the court.</u> UHS followed-up on April 19 with a written proposal that included the names of the six plaintiff liability experts it intended to approach, if it could get Mylan's and Ranbaxy's general agreement that Mylan and Ranbaxy would adopt the expert reports and testimony that they had respectively offered in response to those plaintiff liability experts. UHS noted in the original email that, once the parties agreed to the proposal, UHS would approach the experts to confirm their availability and willingness to be retained to assist in this manner.

(ECF No. 99, at pp. 5–6 (emphasis added).)

Mylan did not agree to this proposal because it wanted to use new experts of its own. Ranbaxy,

however, "agreed conceptually" with UHS and "was willing to work with UHS regarding a formal

agreement" to "streamline the issues" and "reduce the need for a lengthy, if any, expert discovery

period before trial." (<u>Id.</u> at 6.) UHS concurred with Ranbaxy, stating:

> UHS believes the proposal would greatly streamline the process of preparing for trial. UHS would adopt the reports and testimony of certain specific liability experts, and Mylan and Ranbaxy would adopt the testimony of the corresponding experts that they had previously proffered in response to those experts. UHS expects to offer other

---

manufacturer Cephalon and two generic manufacturers Teva and Barr (collectively, "the Cephalon Parties"). UHS subsequently renounced the settlement, claiming that there was no binding and enforceable settlement agreement and that its lawyers were not authorized to enter into such an agreement. UHS then initiated the current individual antitrust lawsuit against the Cephalon Parties, Ranbaxy, and Mylan. The Cephalon Parties had to sue to enforce the settlement agreement. Following a protracted hearing, I issued an opinion, dated September 19, 2018, finding that the settlement agreement between UHS and the Cephalon Parties was binding and enforceable. Thus, at that point, the Cephalon Parties were no longer part of the <u>United</u> case. But UHS's insistence that they not be bound to the settlement took substantial judicial resources to resolve.

experts and anticipates that Mylan and Ranbaxy would offer corresponding expert testimony.

(Id.)

At the Rule 16 conference on June 11, 2018, trial scheduling was fully discussed. Counsel for Ranbaxy understandably advised that his client preferred to defend against all plaintiffs at the same time (including the DPPs, EPPs, and UHS), instead of in two separate trials. Ranbaxy's counsel stressed that UHS had "sat on the sidelines" for years while the DPPs in King Drug and the EPPs in Vista had been litigating. (ECF No. 190-3, at 6:12–24, 8:22.) Ranbaxy's counsel also noted that he had received a February 2018 letter indicating that UHS already had new experts, but UHS had yet to disclose these experts. (Id. at 11:5–13.) UHS's counsel confirmed that it had, in fact, hired its own experts on liability and damages, but as there had been no scheduling order in place, there was no date yet to disclose them. (Id. at 15:2–8.)

At that juncture, the following exchange occurred with UHS's counsel:

> THE COURT: . . . The complaint, I think, is self-evident that they've [Ranbaxy] been in the case for a long time, have deposed—I'm going to pick a number out of the air—35 to 50 experts so far. And now—on . . . what are admittedly complex theories, you have now hired new experts . . . and he's already—they've already dealt with every expert in this area. And now they've got to deal with new ones. So that's why he [Ranbaxy's counsel] was upset.
>
> MR. HUME: Well, we're entitled to have our own experts, and we're trying to use the experts from the other case to the maximum extent possible, consistent with our rights as an independent litigant to use our own experts. So we had made a proposal to the defendants that we get to adopt the prior experts on the technical patent questions and related question son the agreement. Six experts. So we're adopting six. We want to.
>
> THE COURT: How many new?
>                              . . .
> MR. HUME: Two.
>                              . . .
> THE COURT: Six adopting, two new; that's good news.
>                              . . .

5

> MR. HUME: But the proposal hasn't been accepted. Until it's accepted, it's very hard for us—for us to commit to a schedule. I mean—
>
> . . .
>
> MR. HUME: In terms of being ready in October, Your Honor, after this scheduling conference was set, at this time, it was our understanding that the trial wouldn't proceed in our case in October. Our experts—the two that we are definitely using, now have scheduling conflicts that's going to make it extremely difficult. There's no way we can suddenly have expert reports in July, in two or three weeks as Ranbaxy is claim—requesting.
>
> . . .

(Id. at 15:11–17:2.)

At the close of the conference, I reaffirmed and concluded that neither the United case against Ranbaxy nor the United case against Mylan should proceed to trial in October, along with DPPs in King Drug and the EPPs in Vista. (Id. at 17:5–22.) Nonetheless, I again invited the parties to submit letters/e-mails regarding their positions. Two days later, I emailed all counsel asking (a) if the UHS were to proceed against Ranbaxy and Mylan in the October trial, whether Ranbaxy would agree to forego its request to file motions for summary judgment, and (b) what Mylan's position was as to an October trial against UHS. (ECF No. 189-2, Ex. 1, at p. 4.) UHS responded on June 15, 2018:

> United is prepared to try its claims as promptly as possible. United would be prepared to try its liability claims on October 1[, 2018] if: (a) defendants agree, as United has, to adopt all prior liability expert opinions and forego any additional depositions of any of the various experts; and (b) all parties for[e]go filing summary judgment and Daubert motions. With those assurances in place, United would also need agreement from the direct purchaser plaintiffs (DPPs) that United can retain and rely on the same experts DPPs plan to call to testify on issues of liability . . . . United believes that the DPP counsel are willing to work jointly with United's counsel to try the Ranbaxy liability claim on October 1, [2018,] including allowing United to adopt and present the experts already retained by the DPPs.

(ECF No. 189-2, Ex. 1, at p. 2.) UHS reserved its right to produce its own damages expert should the trial reach that phase. (Id.)

UHS made a similar important representation about experts in an e-mail exchange among counsel on June 15, 2018. Specifically, counsel for Ranbaxy referenced UHS's June 15, 2018 e-mail

to the Court and asked, "Does this mean UH[S] will not have any 'new' experts?" (ECF No. 189-2, Ex. 2, at p. 1.) Counsel for UHS replied that "United would have no new experts if it went to trial on October 1 with the DPPs in <u>King Drug</u> on liability and causation. Under this proposal, United will engage a new expert on damages only, and would expect that the parties would conduct/conclude expert discovery on damages after the October 1 trial." (<u>Id.</u>)

Upon consideration of the parties' letters regarding trial scheduling, I decided, through a July 10, 2018 Order, that UHS's claims against Ranbaxy, but not those against Mylan, would proceed to trial on October 1, 2018, along with the DPPs in <u>King Drug</u> and the EPPs in <u>Vista</u>. (ECF No. 105.) On the same date, I issued a Scheduling Order for UHS's claims against Mylan, setting deadlines for fact discovery, expert discovery, and dispositive motions, with the understanding that trial would be scheduled at a later date. (ECF No. 106.)

During pre-trial submissions among the remaining parties in the October 1, 2018 trial,[5] UHS provided an updated witness list, advising that UHS would call six expert witnesses and twenty-one fact witnesses. (ECF No. 189-2, Ex. 4.) Consistent with the agreements reached above, all of these experts had previously been disclosed either in the <u>King Drug</u> case, except one—Dr. Hal Singer— who had been an expert previously retained in another modafinil-related case.

On September 27, 2018, just prior to the start of the October 1, 2018 trial, the DPPs and Ranbaxy settled. That development created a situation where the October 1, 2018 trial now only involved UHS versus Ranbaxy, while UHS also was pursuing the same type of claims against Mylan that was progressing under a separate discovery schedule. This dynamic created an untenable scenario where two trials would have to be held for one plaintiff suing two separate generic drug manufacturers under the same theories and set of facts.

---

[5] Prior to the October 1, 2018 trial date, the EPPs in the <u>Vista</u> case informed the Court that they had reached a settlement with Ranbaxy and would not be proceeding to trial.

Consequently, I held a telephone conference with counsel for UHS and Ranbaxy to determine whether the October 1, 2018 trial should be postponed, noting that "it seems to be much more sensible to have a United v. Mylan and Ranbaxy trial in the summer of 2019, as opposed to two separate, four-week trials on essentially identical issues with the same plaintiff." (E-mail from the Court, Sept. 27, 2018.) Following the telephone conference, I postponed the October 1, 2018.

On October 9, 2018, I conducted another telephone conference in the United case for purposes of scheduling a trial to include both Ranbaxy and Mylan. During that conference, the parties agreed that UHS and Mylan needed to engage in additional fact and expert discovery. Importantly, at no point during this call did counsel for UHS indicate that he believed his client was no longer bound by its prior agreement with Ranbaxy regarding the use of only previously-disclosed experts. Nor did UHS's counsel suggest that he needed additional expert discovery or that he intended to retain new experts. (See ECF No. 233-1, Ex. 1, at 15:4–7.) UHS now takes the position that although its counsel was silent on the potential need to hire new experts, an issue that should have been raised, it reasonably operated under the assumption that the postponement of the October 1, 2018 trial somehow resurrected its opportunity to obtain new experts. (Id. at 15:9–16:6.)

Following the October 9, 2018 scheduling conference, I issued an October 16, 2018 Order setting the trial for July 8, 2019, and stating, in pertinent part, that "[f]act discovery between United Healthcare and Mylan only shall be completed by December 15, 2018," "[p]laintiff shall serve its initial expert reports by January 17, 2019," and "[d]efendants shall serve their responsive expert reports by March 14, 2019." (ECF No. 180 (emphasis omitted).) Despite my continuing attempts to set discovery deadlines, UHS again remained silent regarding its intention to enlist the services of numerous new experts to prosecute its case against Ranbaxy.

In late November 2018, UHS and Ranbaxy met and conferred on trial issues, during which time UHS revealed, for the first time, that it intended to offer new expert opinions against Ranbaxy.

In a subsequent e-mail from UHS to Ranbaxy, counsel for UHS indicated that it intended (a) to have between five and seven new experts that had never previously testified in the case, and (b) to adopt the prior expert reports and opinions of three other experts. (ECF No. 189-2, Ex. 5, at pp. 2–3.) UHS explained that it had "made clear previously that we expected to have our own experts (as is our right under the normal rules), and our agreement to adopt the King Drug plaintiffs' experts and their previously prepared reports was done to accommodate Ranbaxy's desire that UHS participate in the October 2018 trial with the King Drug plaintiffs." (Id. at p. 2.)

Counsel for Ranbaxy objected, responding:

> As part of the agreement we reached with UHS leading up to the October 1 trial, UHS was adopting the King Drug experts and was not going to inject brand new experts, and their new reports and opinions, into the trial. The fact that the Court postponed the trial did not re-open expert discovery, and UHS did not ask the Court to do so, or suggest[] to us that it would do so, if the case was postponed. If this had been your plan, then you should have disclosed it to us and the Court during our discussions about the trial date, as we were all entitled to know about, and properly vet with the Court, the added expenses and burden this will add to this 12-year old litigation. This should not have been something you only disclosed when pressed during our recent call. This is particularly true given the compressed schedule that remains before the July trial date.

(Id. at pp. 1–2.)

On December 31, 2018, Ranbaxy filed the current Motion to Preclude UHS from Asserting New Experts, New Expert Opinions, and New Legal Theories at this Late Stage of the Case. (ECF No. 189.) Thereafter, on January 17, 2019, UHS provided its expert witness disclosures, officially naming six new experts. On May 9, 2019, I held argument on the Motion, at which time I excluded some of the proposed expert testimony from one of the proposed new UHS experts, Polk Wagner.[6] (ECF No. 226.) I further directed Plaintiff to submit proffers of testimony for the remaining five new

---

[6] UHS proposed to call Polk Wagner to opine as to when the trial judge in the underlying patent case would have issued rulings on infringement and invalidity. I found that such opinions were not appropriate for expert testimony.

expert witnesses.  (Id.)  Following these proffers, the parties submitted additional briefing regarding their positions as to the admissibility of these new expert opinions.

## II.     DISCUSSION

Federal Rule of Civil Procedure 37(c)(1) states that when a party fails to provide or identify a witness as required by the Federal Rules, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  The United States Court of Appeals for the Third Circuit has enumerated four factors for the district court to consider before prohibiting evidence under this Rule: "(1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or willfulness in failing to comply with a court order or discovery obligation."  Nicholas v. Pa. State Univ., 227 F.3d 133, 148 (3d Cir. 2000).  In addition, the district court should consider the importance of the excluded testimony.  Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 719 (3d Cir. 1997).

Ranbaxy primarily objects to the opinion of any new expert on grounds of timeliness. Ranbaxy stresses that UHS agreed to proceed to trial in October 2018 against Ranbaxy without any new experts and then quietly changed course, identifying at least seven new experts.  Ranbaxy points out that (1) UHS never reserved its right to add experts if the trial date changed, and (2) when the October 2018 trial was postponed, UHS never suggested—to either the Court or Ranbaxy—that it would seek to use the additional time to add new liability or causation experts against Ranbaxy.  As such, Ranbaxy posits that it never had the opportunity to timely address this issue during the October 9, 2018 scheduling conference.  In addition to the timing issues, Ranbaxy also presses that UHS is attempting to offer new expert opinions to change its causation theory and fill perceived holes in its

case.  (Ranbaxy Supp. Br. Opp'n Untimely Experts, ECF No. 233, at p. 3.)  Ultimately, Ranbaxy contends that admission of any of these new expert opinions will result in prejudice because it will have to defend against a new causation theory, conduct additional depositions, engage in another round of Daubert briefing, and prepare and present additional evidence necessary to respond to the new causation theory.[7]

UHS responds that, in an effort to work with the Court and allow Ranbaxy to defend its case only one time, it agreed to not use its own newly-identified experts only if it went to trial on October 1, 2018 with the King Drug plaintiffs.  According to UHS, it never agreed to waive its rights to use its own experts, either against Ranbaxy or Mylan, in the event the October 2018 trial did not proceed. UHS contends that it reasonably understood that it would be permitted to offer new experts when the case was consolidated into one trial against both Mylan and Ranbaxy.  Finally, UHS disagrees that it has advanced new causation theories.  UHS asserts that several of the "new" experts are asserting the same theories as experts previously retained by other plaintiffs, and that Defendants will not suffer unfair prejudice from having to engage in normal expert discovery and Daubert briefing with respect to new experts.

Having carefully reviewed the record in this case and the exhibits provided by the parties, I conclude that UHS's production of six new experts—five of whom offered opinions as to Ranbaxy— contravenes the numerous discussions and written exchanges among the Court and the parties, which, either directly or in spirit, reflect UHS's intent to not introduce any new experts against Ranbaxy. And, in any event, given the extensive scheduling discussions that have taken place, UHS was certainly obligated to advise the court and Ranbaxy of these new experts.  Several facts support this conclusion.

---

[7]  Mylan joins in Ranbaxy's Motion to the extent Ranbaxy seeks to preclude experts Dr. Rena Conti and Dr. Scott Hemphill (discussed infra).

First, in the Rule 26(f) Report filed prior to the June 11, 2018 scheduling conference, UHS—acting with the understanding that no trial date had yet been set on its case against Ranbaxy and Mylan—unilaterally offered to adopt the opinions of certain specific liability experts used in other parts of this case, provided that Mylan and Ranbaxy did the same. Although no agreement was ever reached at that time, it was UHS that proposed and pursued the limitation on expert discovery. And it is telling that UHS's counsel, who has meticulously attempted to manage every detail in this case, never raised a possibility that the use of prior experts was for a limited and discrete purpose.

Second, during the subsequent Rule 16 conference, while counsel for UHS generally expressed that it was entitled to have its own experts, counsel reiterated that "we're trying to use the experts from the other case to the maximum extent possible." (ECF No. 190-3, 15:19–21.) When pressed on this issue, counsel explicitly represented, on the record, that UHS planned to adopt six prior experts and have only two new experts, a far cry from the six new experts it sprang upon Ranbaxy in January 2019.

Third, in emails exchanged in June 2018, UHS stated to both the Court and counsel for Ranbaxy that it would be prepared to try its claims against Ranbaxy during the October 1, 2018 trial, and that it would have "no new experts if it went to trial on October 1 with the [King Drug Plaintiffs] on liability and causation." (ECF No. 189-2, Ex. 2, at p. 1.) Although UHS highlights its use of the words "if it went to trial on October 1" it is notable that UHS never suggested that its agreement would not hold if it did not proceed to trial in October. Indeed, in a different email to the Court, UHS stated that "[UHS] would be prepared to try its liability claims on October 1 if . . . defendants agree, as [UHS] has, to adopt all prior liability expert opinions and forego any additional depositions of any of the various experts." (ECF No. 189-2, Ex. 1, at p. 1.) The phrasing of this email suggests that regardless of the October 1 trial date, UHS had already agreed to not have new liability experts.

Fourth, during the October 9, 2018 status/scheduling conference, following the <u>King Drug</u> plaintiffs' settlement with Ranbaxy, the discussion focused heavily on additional fact and expert discovery that needed to occur between UHS and Mylan. At no point during that conference did counsel for UHS indicate, or even remotely suggest, that UHS considered its expert agreement with Ranbaxy null and void, and that it intended to engage additional experts with respect to its case against Ranbaxy. In short, UHS failed to clearly advise or confirm with the Court and opposing counsel its assumption that any prior agreement with Ranbaxy regarding expert discovery was no longer in place. Any ambiguity regarding UHS's position could have been clarified by simple notification to Ranbaxy and the Court that because the October 1, 2018 trial did not proceed, it intended to retain numerous new experts offering new theories. Had it done so, the Court would have constructed a schedule giving Ranbaxy the opportunity to pursue the discovery it would obviously have been entitled to undertake. But UHS chose not to provide such notification and waited until almost three months later to alert the Court and Ranbaxy of its newly-retained experts.

Fifth, the subsequent Scheduling Order of July 10, 2018 explicitly stated that fact discovery was limited to UHS and Mylan only, thereby reflecting the parties' general consensus and my understanding that the UHS-Ranbaxy case was ready for trial. In that Order, I directed that "defendants shall serve their expert reports by March 14, 2019." (ECF No. 180.) UHS reads my use of the plural "defendants" as proof that expert discovery had been reopened against Ranbaxy. Yet, the inclusion of "defendants" in that paragraph was nothing more than an effort to ensure the orderly exchange of all expert reports to be used at trial, not an opening to retain six new experts.

Finally, it was not until late November 2018, during a meet and confer to discuss UHS's request for additional depositions of Ranbaxy witnesses, that UHS first revealed that it intended to offer new expert opinions against Ranbaxy. Surely UHS had consulted with and developed these expert theories well before November 2018.

In light of this record, I find UHS's attempted justification of its belated expert disclosures to be disingenuous. I have made every effort to manage discovery in this case in a fashion to avoid surprises and ensure that exchanges were broad, such that all parties fully understood the strength and weaknesses of the opposing parties' evidence. UHS's retention of six new experts is not consistent with how this case has been managed. "Discovery is not supposed to be a shell game, where the hidden ball is moved round and round and only revealed after so many false guesses are made and so much money is squandered." Lee v. Max Int'l, LLC, 638 F.3d 1318, 1322 (10th Cir. 2011). In short, had UHS wished to no longer honor its prior representations that it would not present new experts in its case against Ranbaxy, it was incumbent on UHS to affirmatively say so and to inform the Court and Ranbaxy, during the October 9, 2018 trial scheduling conference, that it would require time for further expert discovery.

Having reached these conclusions, I must still consider the factors enumerated by the Third Circuit, particularly prejudice. See Nicholas v. Pa. State Univ., 227 F.3d 133, 148 (3d Cir. 2000). In doing so, I decline, as Ranbaxy asks, to blanketly exclude all of UHS's new experts. Although Ranbaxy, Mylan, and this Court all proceeded under the understanding that UHS had committed to not retain new experts in its case against Ranbaxy, I am not prepared to find bad faith warranting total exclusion. I am cognizant that UHS's counsel did proclaim that UHS maintained the right to "retain experts and litigate its own case." This is a long way from actually spelling out to all involved that numerous new expert opinions would be offered. But UHS's position does allow for a plausible—albeit tenuous—argument by UHS that it mistakenly believed its agreement as to new experts was contingent on the case proceeding on October 1, 2018.

Moreover, and perhaps more importantly, the trial in this matter has again been continued due to both ongoing mediation efforts and the current discovery dispute. As such, allowing UHS to present some limited new expert opinions will not significantly disrupt the "orderly and efficient trial

of the case." Nicholas, 227 F.3d at 148. At this juncture, I will have the opportunity to re-fashion a schedule that will allow for some additional, limited expert discovery. Although Ranbaxy will undoubtedly face some added burden by having to take additional depositions, I do not find this prejudice to be so excessive such that complete preclusion is warranted. I address the individual admissibility of each expert below.

## A. **Dr. Rena Conti**

UHS's proffer regarding new expert Dr. Rena Conti reflects that UHS intends to offer her as a witness against both Mylan and Ranbaxy for three purposes. First, as to liability, Dr. Conti proposes to opine that Modafinil and armodafinil (the active ingredient in Cephalon's Nuvigil product) comprised a relevant antitrust product market. Second, as to causation, Dr. Conti will testify that generic entry would have occurred sometime before April 2012.[8] Finally, as to damages, Dr. Conti proposes to testify that in the "but-for" world, UHS would have purchased generic modafinil at lower prices and, as such, UHS suffered overcharges between $298 million and $330 million, with the range reflecting different dates for generic entry.

The primary point of contention involves Dr. Conti's testimony that predicts a generic entry date anywhere up through 2012.[9] Both Ranbaxy and Mylan assert that Dr. Conti's testimony improperly reflects a new theory that significantly expands the range of time in which generics would have entered the market. UHS counters that this theory has always been in this case, that Dr. Conti's testimony is not new, and, as such, there is no unfair surprise to either Defendant.

---

[8] Generic entry date refers to the date that, but for the illegal agreements at issue, the generics would have entered the market. UHS bears the burden of proving that alleged anticompetitive conduct precluded an earlier generic entry date.

[9] According to the reverse settlement agreements between Cephalon and the generics, the generics agreed to stay off the market until April of 2012.

A review of the procedural record in the In re Modafinil matter reflects that Defendants' complaints are well founded. As set forth above, Dr. Conti bases her causation opinion on the proposition that, but for the illegal settlement agreements between Cephalon, Ranbaxy, and Mylan, generic entry into the relevant market would have occurred sometime before April 2012. But since both the inception of the In re Modafinil litigation and the initiation of UHS's individual litigation, all of the In re Modafinil plaintiffs, including UHS, have repeatedly emphasized that generic entry would have occurred in 2006. Under this 2006 entry date theory, the operative time span in which Defendants had previously defended their actions was cabined to that time period, as was discovery. This original theory, premised on a 2006 generic entry date, persisted throughout the history of the In re Modafinil litigation in the following manner:

- The Second Amended Complaint, filed in January 2010 in the King Drug case, specifically alleged that "[a]bsent the Generic Defendants' illegal agreements not to compete with Cephalon . . . the Generic Defendants . . . would have begun selling their less expensive generic versions of Provigil, no later than January 2006." (ECF No. 248, Civ. A. No. 06-1797, ¶ 128.)

- When the DPPs in the King Drug case submitted pretrial memoranda in anticipation of a February 2016 trial against the brand and generic defendants, the DPPs alleged that but for the reverse-settlement payments, the Generic Defendants would have launched "at risk" and "lower-cost generic Provigil would have entered the market by June 2006." (ECF No. 929, Civ. A. No. 06-1797, at p. 4.)

- In another modafinil-related case, Apotex v. Cephalon ("Apotex"), the plaintiffs—Apotex, another generic manufacturer, and multiple large drug retailers—advanced a June 2006 launch date. In the April 2017 pre-trial memorandum in that matter, the Apotex plaintiffs asserted that "Ranbaxy would have launched generic Provigil in 2006 but for its anticompetitive agreement with Cephalon." (ECF No. 1095, Civ. A. No. 06-2768, at 28.)[10]

---

[10]  In an effort to establish that its later launch date theory of "sometime before 2012" is not new and had been disclosed previously in the modafinil litigation, UHS argues that in a prior ruling on the causation standard in the Apotex case, I did not define a specific generic entry date. UHS cites to a June 8, 2017 Memorandum Opinion (mistakenly identifying it as a 2015 opinion), wherein I noted that the plaintiffs' theory of causation was that Mylan and Ranbaxy either "would have launched at-risk" or would have defeated Cephalon's '516 patent. (ECF No. 1196, Civ. A. No. 06-2768, at p. 11.) UHS goes on to theorize that since generic competition began in April 2012, this legal standard requires proof that "but for" the reverse payment agreements, generic competition would have started

16

- In the United case, currently before me, UHS adopted a similar theory in its Second Amended Complaint, specifically alleging that "[t]he Generic Defendants . . . expected to enter the market in 2006, even if that meant launching their generic versions of Provigil 'at risk.'" (ECF No. 76, ¶ 84 ("Each of the Generic Defendants prepared internal projections that assumed a generic launch date by June 2006"); see also id. ¶ 126 ("Absent Defendants' unlawful conduct, at least one generic manufacturer, and likely multiple generic manufacturers, would have entered the market with a less expensive generic version of Provigil in January 2006, resulting in substantially lower prices for purchasers throughout the chain of distribution.")

- UHS persisted with this theory, never alleging a generic entry date after 2006—at least until identifying Dr. Conti. In its Pre-trial Memorandum, submitted in advance of the October 1, 2018 trial in the King Drug plaintiffs, UHS specifically alleged that "United expects to show in its damages phase that generic entry would have occurred as early as June 24, 2006, and certainly before December 24, 2006. (ECF No. 132, p. 5.) UHS repeated this theory several more times in the Pre-trial Memorandum. (See id. at p. 6 ("[A]bsent the unlawful agreement between Cephalon on the one hand and Ranbaxy on the other . . . Ranbaxy and other generic manufacturers would have launched generic modafinil in late 2006 . . ."); id. at p. 31 ("As explained above, but for its unlawful settlement agreement with Cephalon, Ranbaxy would have begun selling generic modafinil no later than December 2006, and Teva, Mylan, and Barr would have launched their generic modafinil products at or about the same time.").)[11]

- UHS also submitted proposed jury instructions in connection with the October 2018 trial. In its "Proposed Jury Instruction: 2 The Parties' Contentions," UHS specifically suggested that the jury be told about UHS's position, as follows: "Plaintiffs allege that, in the absence of the reverse payment settlements, Ranbaxy would have launched generic modafinil in 2006, approximately six years before generic modafinil actually became available. Plaintiffs further allege that, once Ranbaxy launched, others would also have launched generic modafinil." (ECF No. 156-1, at p. 4.) Later, in its "Proposed Causation Instruction 4: Reasonable Estimate As To When Generic Provigil Would Have Come to Market," UHS asked that the jury be told, "Ranbaxy would have begun selling generic Provigil at risk once the 30-month

---

any time before April 2012. (UHS Supp. Br., ECF No. 234, pp. 4–5.) Thus, UHS's point is that no June 2006 entry date is specified.

This argument mischaracterizes my Opinion. Although I did not explicitly mention the June 2006 entry date when discussing the plaintiffs' theories of causation, I specifically cited to the plaintiffs' pretrial memorandum as the basis for my summary of this theory. The precise page of the pretrial memorandum I referenced describes the causation theory as involving a generic entry date of June 2006.

[11] In another mischaracterization of the record, UHS cites to only one sentence on one page of its Pre-trial Memorandum, wherein it states that "United contends that Ranbaxy would have entered the modafinil market before 2012 and, but for the unlawful agreement, United would have paid substantially less for the cost of generic." (Id. at p. 31.) In quoting this sentence, however, UHS glosses over its other statements—made in three separate, prior sections of the Pre-trial Memorandum—that generic entry would have occurred sometime *in 2006*.

stay expired in 2006 . . . In summary, Plaintiffs claim that generic competition would have started in 2006, instead of 2012 when it actually began." (Id., at p. 44.) Nothing in these jury instructions even remotely suggests that UHS intended to advance a theory of generic launch after 2006.

- Finally, after the October 2018 trial was continued, and UHS was scheduled to proceed to trial against both Ranbaxy and Mylan in July 2019, Mylan propounded interrogatories upon UHS. One such interrogatory asked UHS to:

> State the earliest date on which you contend generic entry would have occurred but for the settlement agreements described in ¶¶ 4-6 of Plaintiff's Second Amended Complaint; identify the company or companies you contend would have marketed a generic modafinil product on that date; state each factual basis for that contention; and identify each document relied upon in your response.

(ECF No. 233-1, at ECF p. 58.) While the interrogatory asked for only the "earliest date," UHS responded with a specific date, explaining, "UHS states that *the date* on which generic entry would have occurred but for the settlement agreements described in ¶¶ 4–6 of Plaintiff's Second Amended Complaint was June 24, 2006 . . . . Prior to the [reverse-settlement] [a]greements, the ANDA applicants were all preparing to launch their generic products on June 24, 2006, even if the district court did not rule on or before June 24, 2006." (Id. at ECF p. 59 (emphasis added).) UHS did not qualify this response by suggesting that it only represented an "earliest" date and that it intended to prove that generics may have entered at a later date. Viewed in the context of UHS's prior representations about its launch date theory, as well as the representations of all of the other In re Modafinil plaintiffs, the only reasonable reading of this interrogatory response was that UHS was remaining consistent with its prior position and alleging that generics would have launched in 2006.

In short, I find that the sole causation theory previously offered by UHS alleged a generic entry date of sometime in 2006. UHS's efforts to establish that this theory has always been in play are misleading.

Admission of this new theory will be prejudicial to Mylan and Ranbaxy and will disrupt the orderly flow of litigation. See Nicholas, 227 F.3d at 148 (requiring consideration of whether evidence would "disrupt the orderly and efficient trial of the case"). When UHS produced Dr. Conti's expert report in January 2019, fact discovery was closed. Allowing UHS to introduce Dr. Conti's new theory of generic entry occurring anywhere from 2006 to 2012 would create a causation theory encompassing six years upon which discovery had never been undertaken. While the new trial date

has not been set, endless discovery expansion to accommodate UHS's new theory cannot occur. The continuation of the latest trial date was to allow for mediation and the review of potentially-dispositive summary judgment motions, not for re-opening fact discovery on a matter in which there has been over a decade of litigation.[12]

In a further effort to avoid the exclusion of Dr. Conti's opinion, UHS argues that "Defendants are inviting the Court to commit reversible error by ruling that causation can only be shown by proving an 'at risk' launch as of one specific date . . . . That would be legally incorrect." (UHS's Suppl. Resp., ECF No. 234, at p. 6.) This argument conflates a ruling regarding the substantive antitrust law with the basic discovery dispute before me. My decision here should not and cannot be construed as ignoring the obvious proposition that an antitrust plaintiff is permitted to describe the anticompetitive harm from reverse payment agreements as "a delay" in generic competition, regardless of the length of the delay. Rather, the sole problem before me involves whether UHS has belatedly disclosed its alleged generic entry date—a question that implicates my broad discretion to effectively manage the case and exclude experts as appropriate. See ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 268 (3d Cir. 2012); see also In re Asbestos Prods. Liab. Litig. (No. VI), 718 F.3d 236, 246 (3d Cir. 2013) ("[I]n complex cases, district courts must have wide discretion to manage 'complex issues and potential burdens on defendants and the court' namely . . . through managing discovery.").

---

[12]   UHS also incredibly argues that, even if fact discovery were reopened, Ranbaxy would be precluded from responding to Dr. Conti's new theory, based on Ranbaxy's prior stipulation that it would not introduce any such evidence to prove that it could not launch its generic Provigil product due to capacity constraints or cGMP issues. But this stipulation was made in October 2010, when the only causation theory was that Ranbaxy and the other generics would have launched generic Provigil in 2006 but for the reverse-settlement agreements. As such, Ranbaxy had no basis to believe that it would need to use this evidence. Although Ranbaxy renewed its stipulation with UHS in November 2018, Ranbaxy was still not privy to Dr. Conti's new expert report opining that the "but-for" generic launch date could be anywhere up to April of 2012.

Exercising that broad discretion, I find that UHS has consistently adopted a specific date on which generic entry would have occurred in this case and has provided no notice to Defendants or the Court that it would premise its antitrust theories on any other generic entry date. Consequently, UHS may not now produce an expert that vastly expands its causation theory by a period of six additional years. I therefore conclude that Ms. Conti's causation testimony will be excluded under Federal Rule of Civil Procedure 37(c)(1).

With respect to Dr. Conti's proposed market power testimony—that Cephalon's Provigil maintained a monopoly in the relevant market—this opinion simply echoes the opinion of Dr. Hal Singer, who was previously retained by the DPPs in <u>King Drug</u>. UHS intended to rely on Dr. Singer's opinion in the October 2018 trial and explicitly indicated that Dr. Singer was being proffered to discuss (1) the scope of the relevant market; (2) that Cephalon had monopoly power in the relevant market; (3) that the agreement between Cephalon and Ranbaxy was anticompetitive and substantially harmed consumers, including Plaintiffs; (4) that there were no procompetitive justifications for the settlement; and (5) that the anticompetitive effects outweighed any asserted procompetitive justifications. (ECF No. 233-1, Ex. 5, App. B ¶ 10.) Ranbaxy has already deposed Dr. Singer twice and cross-examined him at trial. (ECF No. 233-1, Ex. 1, 76:12–16.) UHS has put forth no reason as to why it cannot continue to use Dr. Singer on this topic.[13]

---

[13]  UHS suggests that it should not "be forced to use economic experts who filed their initial opinions in this case before the Supreme Court <u>Actavis</u> decision," such as Hal Singer. (UHS's Reply Regarding Proffer, ECF No. 234, at p. 10.) Subsequent to the issuance of the <u>Actavis</u> decision, however, I reopened expert discovery in the <u>King Drug</u> case and specifically allowed the submission of supplemental expert reports "to account for changed factual circumstances or the standard recently set forth by the United States Supreme Court in <u>Federal Trade Commission v. Actavis, Inc.</u>, 133 S. Ct. 2223 (2013)." (ECF No. 530, Civ. A. No. 06-1797, at ¶ 4(b).) Dr. Singer submitted such a supplemental expert report on December 20, 2013, and was deposed on that report. (<u>See</u> ECF No. 953, Civ. A. No. 06-1797, at p.10 (referencing Dr. Singer's supplemental expert report).p
)

Nonetheless, and consistent with my rulings on the remainder of the proposed new experts (discussed infra), I will permit UHS to designate *either* Dr. Singer or Dr. Conti to provide an opinion regarding market power. Should UHS elect to use Dr. Conti for this sole purpose, Mylan and Ranbaxy will be allotted four hours each (a total of eight hours) in which to depose Dr. Conti on this opinion.

**B. Dr. Alessandra Barazza**

UHS next proffers testimony by new expert Dr. Alessandra Barazza for use in its case against Ranbaxy. UHS proposes to offer Dr. Barazza's opinion regarding the commercial reasonableness of the Cephalon-Ranaxy API supply agreement, and to opine that the payments Cephalon promised to make to Ranbaxy under these agreements, as well as the payments it actually made under those deals, were neither justified by legitimate API needs nor made as part of reasonable API efforts. (UHS's proffer of testimony, ECF No. 228, at p. 3.) UHS also suggests that Dr. Barazza will serve as a rebuttal expert to Ranbaxy's expert witness, Louis Berneman.

Ranbaxy seeks to exclude Dr. Barazza because these topics were already covered by two of the DPPs' experts in King Drug, Frank Ecock and Shannon McCool, and because UHS intended to rely on these experts for the October 2018 trial. Having already deposed Ecock and McCool, Ranbaxy posits that "[t]here is no reason to require Ranbaxy to take another deposition and engage in Daubert motions practice for an expert that UHS admits covers the same ground as Ecock and McCool." (Ranbaxy Supp. Br. Opp. Untimely Experts, ECF No. 233, at p. 8.)

This argument, standing alone, does not justify exclusion under Federal Rule of Civil Procedure 37. Dr. Barazza's report simply duplicates testimony already considered and addressed by two Ranbaxy experts. These experts, however, are no longer available. Mr. Ecock is deceased.[14]

---

[14] Ranbaxy argues that Mr. Ecock passed away in December 2011, more than six years before UHS agreed to the October 2018 trial date. I remain cognizant, however, that UHS first agreed to adopt prior experts in connection with the October trial in June of 2018, and therefore had little time raise the issues regarding Mr. Ecock. In the interests of expediency, UHS agreed to use his video testimony, which was available only under hostile deposition questioning.

(ECF No. 233-1, Ex. 1, at 41:11–15.)  Further, UHS has advised that it has attempted to reach Mr. McCool, who was previously retained by the <u>King Drug</u> plaintiffs, but he has not returned any of UHS's emails.  (<u>Id.</u> at 42:10–13.)[15]  Finally, although there is some minimal prejudice to Ranbaxy in that it has neither deposed nor filed <u>Daubert</u> motions as to Dr. Barazza, that prejudice is easily curable without significant disruption of the trial schedule.

Accordingly, I will deny Ranbaxy's Motion to Exclude Dr. Barazza and will allow Ranbaxy a single deposition of Dr. Barazza, of no more than six hours, scheduled at a time and place selected by Ranbaxy.

**C.  <u>Thomas Hoxie</u>**

UHS also seeks to offer Mr. Thomas Hoxie as an expert against Ranbaxy to opine on the reasonableness of the modafinil IP license that Ranbaxy granted to Cephalon.  Hoxie proposes to opine that the license was unreasonable, insofar as it required Cephalon to pay up to $5 million to Ranbaxy.  UHS also explains that his testimony will be offered in rebuttal of Ranbaxy's experts Mr. Berneman and Dr. Bell.

Ranbaxy acknowledges that Mr. Hoxie was previously retained by all prior plaintiffs, submitted two expert reports in 2011, and has been deposed on the substance of those reports. Nonetheless, Ranbaxy contends that neither of Mr. Hoxie's prior reports included an opinion on the reasonableness of the Ranbaxy IP license, even though Mr. Hoxie reviewed and responded to a 2011 report from expert Louis Berneman, which opined that the IP license was reasonable.  Ranbaxy now argues that "UHS' bid to have Mr. Hoxie offer an *entirely new opinion* at this late stage of the litigation is thus a transparent attempt to plug a perceived hole in their case."  (Ranbaxy Supp. Br. Opp. Untimely Experts, ECF No. 233, at p. 9 (emphasis in original).)

---

[15]  Ranbaxy takes issue with the fact that UHS did not advise that it was unable to make contact with Mr. McCool until March 1, 2019, six weeks after serving Dr. Barazza's untimely report.  It is true that UHS probably should have alerted opposing counsel of these circumstances sooner.

Mr. Hoxie's report presents somewhat of a conundrum. On one hand, UHS never previously proffered any expert on the issue of the IP license. Indeed, UHS admitted that it was prepared to proceed to the October trial without any expert on this topic. (ECF No. 233-1, Ex. 1, at 45:7–10.) Although "an expert is not strictly limited to the precise words contained within the expert report, it is axiomatic that an expert may not present new opinions on topics not timely included or otherwise disclosed in the expert's report." Krys v. Aaron, 112 F. Supp. 3d 181, 207 (D.N.J. 2015).

On the other hand, Mr. Hoxie has been an expert in this case for a number of years. Moreover, the subject area itself—the reasonableness of the modafinil IP license—has previously been an issue in this case. Indeed, Ranbaxy has already identified and submitted reports from experts on this very topic.

While I acknowledge the possible prejudice to Ranbaxy should Mr. Hoxie be permitted to testify at this juncture, I do not find that a balance of the Nicholas factors weighs in favor of complete exclusion under Rule 37. Accordingly, I will deny the Motion to Exclude Mr. Hoxie, but permit Ranbaxy to take Mr. Hoxie's deposition for a maximum of six hours solely regarding the IP issue. Ranbaxy's corresponding experts, Mr. Berneman and Dr. Bell, may amend their reports to address only this topic. UHS will not be permitted to re-depose Ranbaxy's experts on their supplemental reports.

### D. **Dr. Scott Hemphill**

Next, UHS proposes to offer the opinion of Dr. Scott Hemphill against both Mylan and Ranbaxy. Dr. Hemphill seeks to opine that Cephalon's settlements with both Ranbaxy and Mylan were anticompetitive as they involved the payment of a large amount by Cephalon to the generics, and the payments were not explained or justified by any procompetitive reason or justification. Dr. Hemphill will also purportedly testify that the reasonableness of the settlement agreements Cephalon

entered into with Teva and Barr should be considered as a means for determining whether the Ranbaxy and Mylan settlements were reasonable.

Ranbaxy does not argue that Dr. Hemphill's theories are either novel or irrelevant to the case.[16] Rather, Ranbaxy seeks to exclude Dr. Hemphill as redundant of the testimony of two other experts UHS was prepared to rely on at the October 2018 trial—Dr. Hal Singer and Dr. Jeffrey Leitzinger. Dr. Singer has submitted four expert reports, been deposed twice, and previously provided trial testimony. Dr. Leitzinger has also submitted four expert reports and been deposed twice. In addition, both Drs. Singer and Leitzinger have been the subject of extensive Daubert briefing. Ranbaxy contends that simply because UHS "prefers" to proceed with the expert it has retained, as opposed to the ones it previously agreed to use, does not mean Ranbaxy and Mylan should be forced to expend additional resources on preparing for this witness.

While I again acknowledge Ranbaxy's concerns, I decline to exclude Dr. Hemphill's opinion. By Ranbaxy's own admission, Dr. Hemphill's report is "redundant." As such, it does not present any surprise testimony that Ranbaxy would be unprepared to address. Ranbaxy's sole complaint involves redoing depositions and re-engaging in Daubert briefing. As noted above, that concern does not justify the blanket exclusion of Dr. Hemphill's report under Federal Rule of Civil Procedure 37, especially given the postponement of the July 2019 trial date. As such, I will deny Ranbaxy's Motion as to Dr. Hemphill, but will permit both Mylan and Ranbaxy to take Dr. Hemphill's deposition at a time and place convenient to Defendants. Mylan and Ranbaxy will be allotted four hours each to question Dr. Hemphill (a total of eight hours). Defendants shall be permitted to amend their existing

---

[16] Mylan does not offer a specific objection to Dr, Hemphill's report except to argue that, to the extent Dr. Hemphill is excluded as to Ranbaxy, he should be similarly excluded as to Mylan.

expert reports, but solely to respond to Dr. Hemphill's testimony. UHS will not be permitted further discovery on any such amendments[17]

### E.  Jack Tupman

The last of UHS's proposed new experts is Jack Tupman. According to UHS's proffer, Mr. Tupman seeks to testify only against Mylan and will opine on the reasonableness of the Fentanyl Option Agreement and the Naltrexone Collaboration Agreement signed between Mylan and Cephalon. As Mr. Tupman's report was timely served under the July 10, 2018 Scheduling Order pertaining to Mylan and UHS, Mylan offers no objection to this report. Ranbaxy also does not challenge its admission.[18] Accordingly, I will allow the report of Jack Tupman.

## III.  CONCLUSION

For all of the reasons set forth above and at the May 6, 2019 oral argument, I will grant in part and deny in part Ranbaxy's Motion to Preclude UHS from Asserting New Experts, New Expert Opinions, and New Legal Theories, and Mylan's partial joinder in that Motion. While I have not excluded Barazza, Hoxie, Hemphill, and Tupman, I nonetheless remind UHS that, at trial, it will likely not be allowed to present multiple expert witnesses on the same issue.

An appropriate Order follows.

---

[17]  Ranbaxy raises several arguments regarding the relevance of Dr. Hemphill's testimony. These arguments, however, are not proper in connection with the pending Motion and are better reserved for Daubert briefing.

[18] Ranbaxy objects "to the extent UHS plans to serve rebuttal reports by Mr. Tupman and others." (Ranbaxy Supp. Br. Opp. Untimely Experts, ECF No. 233, at p. 2 n.1.)  As it is not clear that UHS has any intention of offering such rebuttal reports, and as the parties have not specifically briefed this issue, I decline to address it at this time.